IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| DERECK BOTTOMS, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:16-cv-30 |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | By:  Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Dereck Bottoms asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 12. Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence. Therefore, I recommend that the Court **GRANT** Bottoms's Motion for Summary Judgment, ECF No. 13, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 17, and **REMAND** this case for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the

burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden

shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

This case is before the Court following a lengthy procedural history. Bottoms first

applied for DIB and SSI on November 2, 2009, alleging disability caused by memory loss.

Administrative Record ("R.") 207, 220, ECF No. 9. He alleged onset of his disability as

September 1, 2008, at which time he was fifty-seven years old. *Id.* Disability Determination

Services ("DDS"), the state agency, denied his claims at the initial, R. 207–32, and

reconsideration stages, R. 240–65. On June 1, 2011, Bottoms appeared with counsel at an

administrative hearing before ALJ Marc Mates. R. 18–41. ALJ Mates denied Bottoms's claims

in a written decision issued on August 23, 2011. R. 10–17. He determined that Bottoms had

severe mental impairments, but no severe physical impairments, R. 12–13, and that he had the

residual functional capacity ("RFC")[1] to perform a full range of work at all exertional levels with

moderate limitations in his ability to handle detailed instructions and engage in sustained

concentration, R. 14–17. The ALJ found that this RFC did not preclude Bottoms from

performing his past relevant work as a janitor, and accordingly he determined that Bottoms was

not disabled. R. 17. The Appeals Council denied Bottoms's request for review, R. 1–3, and he

subsequently appealed to this Court. In a Report and Recommendation issued on September 16,

2013, United States Magistrate Judge B. Waugh Crigler determined that the Commissioner's

decision was not supported by substantial evidence and recommended remand for further

proceedings. R. 418–29; *see also Bottoms v. Colvin*, No. 4:12cv48, 2013 WL 5533708 (W.D.

---

[1] A claimant's RFC is the most he or she can do on a regular and continuing basis despite his or her
impairments. 20 C.F.R. §§ 404.1545(a), 416.945(a); SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996).

Va. Oct. 7, 2013). Presiding District Judge Jackson L. Kiser adopted the Report and Recommendation on October 7, 2013.

While his appeal was pending before the Court, Bottoms filed new claims for DIB and SSI on May 10, 2013, alleging disability caused by memory loss and glaucoma. R. 430, 444. Finding that he was disabled as of the date of his renewed filings, DDS granted his application for SSI, R. 444–59, but denied his application for DIB because there was insufficient evidence to determine whether he was disabled prior to December 31, 2012, his date last insured ("DLI"), R. 430–43, 462–70. The Appeals Council reviewed these decisions on March 7, 2015 (subsequent to this Court's decision to remand). R. 474–75. It determined that DDS's favorable determination regarding Bottoms's SSI claim was supported by substantial evidence and affirmed the finding that he was disabled for purposes of Title XVI as of May 10, 2013. R. 474. It also found, however, that further administrative proceedings were necessary to determine whether Bottoms was disabled prior to that date. *Id.* Accordingly, the Appeals Council ordered that Bottoms's pending DIB claim be consolidated with his earlier claims considered by Judge Crigler and Judge Kiser, and it remanded the consolidated matter for an ALJ to determine whether Bottoms was disabled through December 31, 2012 (for purposes of DIB), or May 10, 2013 (for purposes of SSI). R. 474–75.

Bottoms returned for another hearing before ALJ Mates on September 29, 2015, and the ALJ heard testimony from Bottoms; Robert L. Muller, Ph.D., a psychological expert; Ronald Clayton Taylor, Bottoms's brother; and V. Anthony Melanson, a vocational expert ("VE"). R. 368–413. The ALJ denied Bottoms's consolidated claims in a written decision issued on December 23, 2015. R. 349–360. He found that Bottoms had severe impairments of loss of central visual acuity/cataracts, cognitive disorder not otherwise specified, and history of

substance abuse in remission, but also found that his history of back pain was non-severe. R. 352–53. He then determined that none of Bottoms's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 353–52. The ALJ next found that from September 1, 2008, through May 9, 2013, Bottoms had the RFC to perform a full range of work at all exertional levels with some additional limitations:

> [Bottoms] was able to perform work involving no ladder/rope/scaffold climbing and no concentrated exposure to hazards, like unprotected heights and dangerous moving machinery. He was also able to perform simple, repetitive tasks that did not involve strict production quotas and were not fast-paced; interact with coworkers, supervisors, and the public; and respond appropriately to change in a routine work setting.

R. 354; *see also* R. 354–59 (explaining the ALJ's reasoning for his RFC finding). Based on this RFC and the VE's testimony, the ALJ determined that he could perform his past relevant work as a counter attendant and therefore was not disabled prior to May 10, 2013. R. 359–60. The Appeals Council denied Bottoms's request for review, R. 338–41, and this appeal followed.

### III. Discussion

On appeal, Bottoms contends that the ALJ improperly found that his chronic back pain—specifically, pain in his upper back near the shoulders resulting from a stab wound—was non-severe, Pl.'s Br. 5–7, ECF No. 14, and that the ALJ's hypothetical to the VE and corresponding RFC determination failed to account for functional limitations established in the record, *id.* at 7–9. I consider each of these objections in turn.

*A.     Severe Back Impairment*

*1.     Relevant Facts*

*a.     First Application for Benefits*

Beginning in November 2006, Bottoms treated with his primary care physician, Dante S. Bruno, M.D., for complaints of pain in his back. *See* R. 289–93, 320–22, 327–33, 335–37

(documenting treatment from November 27, 2006, through January 24, 2011). Dr. Bruno's handwritten treatment notes provide sparse detail as to the nature and location of Bottoms's pain. At his initial visit on November 27, 2006, Bottoms described pain originating in his right mid-back and moving down his right leg. R. 333. Bottoms reported that his past treatment, including Percocet, had "helped a lot." *Id.* Dr. Bruno diagnosed back pain with radiculopathy, prescribed Percocet and Sterapred, and noted that an X-ray would be deferred. R. 328, 333. Dr. Bruno's subsequent notes over the next few years document lower back pain or simply "back pain," and he does not appear to have recorded any noteworthy examination findings. *See* R. 329–33. He maintained Bottoms's prescription for Percocet, occasionally prescribed Sterapred and Motrin, and advised Bottoms to try to lose weight through diet and exercise, but he did not provide any other type of treatment. R. 328. At his final documented visit with Dr. Bruno on January 24, 2011, Bottoms "presented with back pain" and stated that he needed a refill of Percocet. R. 336–37. On examination, he had good posture; no tenderness; normal range of motion, stability, muscle strength, and tone; and otherwise benign findings in his ribs, spine, sacroiliac joint, and hips. *Id.* Dr. Bruno diagnosed "back pain" and renewed Bottoms's prescription for Percocet. R. 337.

In conjunction with his first disability application, Bottoms underwent X-rays of the lumbar spine on April 15, 2010, which showed minimal degenerative changes in the facet joints, but were otherwise unremarkable. R. 303. On April 20, Bottoms was evaluated by consultative examiner Ericka Young, D.O. R. 299–302.[2] Bottoms told Dr. Young that he had low back pain, for which he had seen a doctor and received medication, but he could not afford to fill his

---

[2] Bottoms also mentioned his back pain during a June 3, 2010, mental consultative examination, reporting that he had been stabbed "less than ten years ago" and had a hole in his back from the stab wound, and he stated that he "also ha[d] some sort of unspecified pain in his back." R. 307. The examiner made no findings as to Bottoms's back impairment.

prescription. R. 299. He denied radiculopathy or change in bowel or urinary habits. *Id.* He reported that his problems with his back started when he was stabbed in the back six years earlier. *Id.*

Examination findings were normal as to his neck and extremities, and he had normal range of motion in all joints. R. 300, 302. Finger-to-nose test was normal, he could walk on his toes, and he did not use or need an assistive device, but he had abnormal heel-to-knee tests and could not walk on his heels. R. 300. Straight leg raise test was normal, and no increase in iliopsoas spasm was noted. *Id.* Bottoms had full strength of the upper and lower extremities and with his grip, but he had reduced manual dexterity, which Dr. Young attributed to problems with mentation.[3] R. 300–01. Sensory examination was normal and reflexes were intact. R. 301.

Dr. Young diagnosed back pain and opined that this would limit Bottoms to six hours of standing or walking in an eight-hour workday with breaks needed from time to time to rest his back; sitting with restrictions, as he would need to get up and walk around every three to four hours in order to stretch his back; lifting up to twenty pounds frequently and twenty-five pounds occasionally; frequent postural limitations with bending; and occasional postural limitations with sitting and crouching. R. 301. Dr. Young also stated that Bottoms should use a cane on uneven terrain on account of what appeared to be slight balance issues on examination. *Id.*

On initial review, in an opinion dated July 13, 2010, DDS reviewing expert J. Astruc, M.D., found that the record did not support a finding of a severe physical impairment. R. 211–12, 224–25. Dr. Astruc noted that imaging revealed minimal degenerative findings, Bottoms had good range of motion and motor strength on examination, and he had reported not taking pain medication. R. 212, 225. Furthermore, an investigative report, *see* R. 203–06, stated that Bottoms

---

[3] Dr. Young's observations and opinion regarding Bottoms's mentation difficulties are discussed in greater detail in Pt.III.B.1.a, *infra*.

was steady on his feet and could enter an office building without difficulty. R. 212, 225. On reconsideration, DDS expert James Darden, M.D., affirmed Dr. Astruc's finding. R. 245, 258.

In submissions for Bottoms's first disability application, Bottoms and Taylor, with whom he lived, did not report limits to his everyday functioning caused by his back pain, stating that he could perform household chores, go on walks, attend social functions, and shop for groceries. *See* R. 139–49, 159–69, 185–92. Bottoms stated that his impairment caused difficulty with bending, R. 167, although Taylor did not, R. 145. In a pain questionnaire completed on February 17, 2010, Bottoms described having "back pain, lower back" that was aching in nature, lasted around a half hour, was made worse by bending over, stayed in one place, and had been present for three years. R. 154–55. During his testimony at the first hearing before ALJ Mates, Bottoms testified that his pain was located where he had been stabbed, which he described as being "right above the spine" and "around the top part of [his] shoulders." R. 24. He described the pain as sharp and exacerbated by cold. R. 24–25. He reported that his pain came and went and was helped by taking half a Percocet and resting. R. 25–26. He had no difficulty with personal care, did chores and went for walks (but could not walk or stand for more than an hour), and described no problems with sitting or bending. R. 26–28. He reported that he could reach overhead only about five or six inches. R. 28.

In his first opinion denying Bottoms's claims, ALJ Mates found that the record did not support a finding of any severe physical impairment. R. 12. He noted that Bottoms saw Dr. Bruno intermittently for his back pain and had benign hip and spine examination with normal range of motion. R. 12–13. The ALJ acknowledged that Dr. Young assessed physical limitations, but he determined that these were based entirely on Bottoms's subjective complaints, as she had no imaging to review and recorded examination findings of full strength, ability to toe-walk, and

normal range of motion. R. 13. He then noted that Bottoms's lumbar X-ray showed only minimal degenerative change and that the DDS experts found no severe physical impairment. *Id.*

On appeal, Judge Crigler found this explanation to be insufficient. He observed that both Dr. Bruno and Dr. Young had diagnosed Bottoms as having back pain, Dr. Bruno had prescribed medication, and no evidence contradicted these diagnoses or choice of treatment. R. 427. He then pointed out that the ALJ failed to acknowledge Dr. Young's findings that Bottoms had abnormal heel-to-knee test and was unable to walk on his toes. *Id.* Judge Crigler next determined that the ALJ's focus on Bottoms's lumbar spine X-ray, which showed minimal degenerative changes, was misplaced, as Bottoms had "asserted pain in his upper back due to a stab wound, not pain in his lower back due to degenerative disc disease." R. 427–28. He therefore criticized the ALJ's implicit determination that "because there were normal objective lower back findings, then [Bottoms] suffered no severe upper back impairment. This is essentially like saying that because there are no foot impairments, the upper leg must also be unimpaired." R. 428. Finally, Judge Crigler found that the ALJ should have assessed Bottoms's credibility as to the intensity, persistence, and limiting effects of his pain. *Id.* Because of these deficiencies in the ALJ's analysis, he found that the determination that Bottoms had no severe physical impairment was not supported by substantial evidence and remand was therefore necessary. *Id.* The Commissioner did not object, and Judge Kiser adopted this opinion in its entirety and ordered remand. R. 418.

        *b.*     *Second Application for Benefits*

There is little evidence pertaining to Bottoms's back pain following the ALJ's first denial of his claims. On November 11, 2013, during an evaluation of Bottoms's mental functioning, consultative examiner E. Wayne Sloop, Ph.D., observed that Bottoms walked somewhat slowly,

but otherwise had no difficulty ambulating, and he had no problems with his posture. R. 728.
Bottoms did not mention having back pain, although he discussed having problems with other
physical ailments including glaucoma and pre-diabetes, *see* R. 729, and Dr. Sloop did not include
any back impairment in his Axis III diagnosis, R. 733. On February 8, 2014, during a hospital
visit for treatment following a seizure, CT imaging was taken of Bottoms's cervical spine and
showed degenerative disc disease with severe disc narrowing at C3-4, C4-5, and C5-6 and no
evidence of fracture. R. 878. Finally, during an April 28 appointment for treatment of hepatitis,
Bottoms demonstrated on examination normal gait, muscle strength, and joint range of motion,
with no tenderness in the back or neck. R. 834.

      In his renewed application for benefits, Bottoms alleged disability caused by memory
loss and glaucoma, but did not allege that his back pain was a disabling impairment. *See* R. 430,
444. On initial review, DDS did not list Bottoms's back pain as a medically determinable
impairment, *see* R. 438, 452, and it assessed a physical RFC with no exertional or postural
limitations except for a restriction of climbing ladders, ropes, or scaffolds, R. 440, 454–55. On
reconsideration, DDS found that prior to the DLI, Bottoms had a severe impairment of
degenerative disc disease, R. 467, but no RFC was determined for lack of sufficient evidence, R.
469.

      Bottoms submitted a pain questionnaire on June 20, 2013, but answered all questions
with "NA." R. 597–98. In his function report, he alleged no limitations in his physical abilities.
*See* R. 609–16. At the second hearing before ALJ Mates, Bottoms testified that he was still
having problems with his back and could lift about twenty pounds. R. 390–93. He stated that he
went on walks around the block every day and cleaned around the house. R. 394.

In his second opinion denying Bottoms's claims, the ALJ determined that Bottoms's back pain was non-severe. R. 352–53. He noted that Dr. Bruno's records indicated a gap in his treatment from January 2007 until November 2009—a thirty-four-month period spanning Bottoms's alleged onset date. R. 352.[4] He acknowledged that Bottoms received prescriptions for Percocet as late as January 2011, but he pointed out that this last refill was provided in spite of normal examination findings, including benign joints and normal hip range of motion, stability, and strength. *Id.* He listed Dr. Young's examination findings, including Bottoms's ability to walk on his toes but not his heels, full strength in the upper and lower extremities, negative straight leg raise, normal sensation, intact reflexes, and no range of motion deficits in any of the joints, including the spine. *Id.* Finally, he pointed to Bottoms's lumbar spine X-ray, which showed only minimal degenerative changes in the facet joints. *Id.* The ALJ concluded that Bottoms's back disorder was non-severe during the relevant period "because he did not require significant medical treatment for this impairment during this period and it did not result in continuous exertional or non-exertional functional limitations." R. 353. Later, in his RFC discussion, the ALJ found that Bottoms's allegations of pain were less than fully credible on account of his infrequent and conservative treatment, improvement with medication, and ability to perform a range of daily activities. R. 357–58. He also gave limited weight to Dr. Young's opinion, finding that her assessment of physical limitations caused by back pain was contradicted by the normal findings on examination, including normal range of motion in all joints tested. R. 359.

### 2. *Analysis*

---

[4] As Judge Crigler noted, this gap in Bottoms's treatment with Dr. Bruno may be explained by the fact that he was not living in Virginia at this time. R. 428 (citing R. 305). There is no evidence in the record that he sought treatment elsewhere during this period, however.

At step two, the ALJ determines whether a claimant has a "severe medically determinable physical or mental impairment . . . or a combination of impairments that is severe." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

> [A]n impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.

SSR 96-3p, 1996 WL 374181, at *1 (July 2, 1996); *see also* 20 C.F.R. §§ 404.1520(c), 404.1522(a), 416.920(c), 416.922(a). This determination "requires a careful evaluation of the medical findings that describe the impairment(s) . . . and an informed judgment about the limitations and restrictions the impairment(s) and related symptom(s) impose on the individual's physical and mental ability to do basic work activities." SSR 96-3p, 1996 WL 374181, at *2.

As an initial matter, I note that the ALJ seems to have repeated the error identified by the Court in its earlier opinion by failing to distinguish between Bottoms's lower back pain, which was attributable to degenerative changes in his lumbar spine, and his upper back pain, which Bottoms attributed to a stab wound. The analysis in his second opinion yet again conflates these distinct sources of pain and assesses them as a single impairment of "back pain." That the ALJ disregarded the Court's explicit reasons for finding error is troubling. Nonetheless, his augmented discussion of Bottoms's pain (no matter the source) makes clear that any error would have been harmless. *See Kersey v. Astrue*, 614 F. Supp. 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the error.").

As the ALJ noted, Bottoms's treatment with Dr. Bruno was limited and conservative, consisting only of medications. Dr. Bruno himself provided little explanation of the nature of

Bottoms's pain, and it is not clear from his treatment notes whether Bottoms saw him for his upper or lower back pain. Moreover, the objective findings in the record, other than some limited observations from Dr. Young's consultative examination (which themselves do not seem to relate to Bottoms's upper back pain), are entirely benign. Additionally, Bottoms himself described almost no limitations caused by his pain except for difficulty bending (which would also be more likely attributable to a lower back impairment than an injury around his shoulders), and he did not allege any difficulties with his back in the pain and function reports for his second application. He also testified that his pain was well controlled with medication, and the ALJ properly found that this weighed against a finding of functional limitations from any sort of back pain. *See Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) ("If a symptom can be reasonably controlled by medication or treatment, it is not disabling."). In light of the very limited evidence of a back impairment in the record, I find that substantial evidence supports the ALJ's determination that Bottoms's back pain (upper or lower) was non-severe.

B.    *Residual Functional Capacity*

    1.    *Relevant Facts*

        a.    *First Application for Benefits*

Bottoms also argues that the ALJ failed to provide for limitations in his RFC that were established in the record. Namely, he contends that the ALJ erred by not including any manipulative limitations with fine motor movements, Pl.'s Br. 7–8, and not providing sufficient mental limitations to account for issues with his memory and slow mentation, *id.* at 8–9. All of these limitations are attributable to Bottoms's cognitive impairment, which resulted from his being struck in the head with a pistol during a robbery, left unconscious for several days, and

taken to the hospital for surgery, *see, e.g.*, R. 659.[5] The earliest documentation of this

impairment in the record is Dr. Young's consultative examination of April 20, 2010, during

which she observed that Bottoms had impaired short term memory, as evidenced by his inability

to recall three one-syllable words after a one-minute delay. R. 300. He was alert and oriented

with normal mood and affect, limited fund of knowledge (Bottoms had only finished the tenth

grade), and adequate thought processing ability. *Id.* He had 4/5 manual dexterity bilaterally, as

indicated by his difficulty with opening a screw top bottle of cleaner, which Dr. Young thought

was related to slight sluggishness in his mentation. R. 300–01. Accordingly, she opined that he

would have manipulative limitations with fine motor movements, but no limitations with gross

motor movements, grasping, reaching, handling, or feeling. R. 301. She further stated that

Bottoms should not drive, climb, or work around heavy machinery because of his slow mentation

and slow reaction time. *Id.*

At a June 3 mental consultative examination with Frank Russell, Ph.D., R. 305–11,

Bottoms reported that he had stopped working eight months earlier because of forgetfulness and

---

[5] The record is inconsistent as to when this incident occurred. At a mental health visit in May 2011, Bottoms reported that the assault took place five years earlier (i.e., 2006). R. 659. In his first hearing before the ALJ, Bottoms testified that the assault occurred in 2007, R. 23–24, and during the second administrative hearing the psychological expert gathered from his review of the record that it happened in 2006, R. 375. Bottoms's earnings record shows consistent earnings from 1996 to 2008, except in 2007 when he earned only $735.53. R. 122–25. This break in work provides an inference that Bottoms's head injury occurred around 2007, as no other reason for this break is apparent in the record. Other statements vary wildly from this time period, however. During a consultative examination in June 2010, Bottoms stated that his head injury had occurred eight years earlier (i.e., 2002). R. 310. At another consultative examination in November 2013 and in his function report, he stated that the attack happened in 1991. R. 616, 729. During a hospital visit in February 2014 following a seizure, Taylor told Bottoms's doctors that the incident occurred in 1982. R. 857. In his second opinion denying Bottoms's claims, the ALJ read the evidence as showing that Bottoms sustained his head injury in 1991. R. 357 (citing R. 729).

There are no contemporary legal or medical records directly documenting the injury, but CT imaging of Bottoms's head, taken after the relevant period, showed evidence of brain damage and prior surgical intervention. R. 810, 877. Thus, there is no question that Bottoms in fact suffered some form of traumatic brain injury.

"losing thought." R. 306. Bottoms stated that after his assault and subsequent brain surgery, it took a couple years for him to regain his thought process. R. 307. He denied having received prior mental health treatment or medication. *Id.* Mental status examination revealed restricted affect, stable mood, and no sign of psychotic process. R. 308. His thought processes were organized, logical, and coherent, and his associations were tight. *Id.* Bottoms could state his name and the date, but did not know which day of the week it was. *Id.* He had fair immediate auditory memory, being able to recall five digits forward, but only three in reverse. *Id.* Recent memory was fair, as he could recall his last meal, but not the examiner's name, and remote memory was good, as he could remember where he was born, the last three presidents of the United States, and his mother's maiden name. *Id.* He had good calculation and abstract thinking abilities, fair insight and judgment, and poor fund of information. R. 309.

Dr. Russell noted that Bottoms reported having "relearned" his cognitive functioning since his injury, but had difficulty remembering, quickly forgot what people said, and had some unspecified difficulty with his thought process. R. 310. He diagnosed cognitive disorder, not otherwise specified, and alcohol and opioid dependence in sustained full remission. *Id.* He observed that it was unsurprising for Bottoms to have some compromise of his cognitive functioning given his head injury and extensive history of drug use, but he noted that Bottoms could effectively (if not articulately) convey his personal history. *Id.* Based on his diagnoses and observations, Dr. Russell opined that Bottoms was moderately impaired in his ability to perform detailed and complex tasks and had some difficulty with immediate auditory memory. R. 309. He also found, however, that Bottoms was unimpaired in his ability to perform simple and repetitive tasks on a consistent basis and maintain regular attendance in the workplace. *Id.* He saw no basis for finding that Bottoms would require special or additional supervision or be

unable to complete a normal workday or week without interruption. R. 309–10. He found no apparent difficulty with Bottoms's ability to engage in appropriate social interactions, but determined that he may need some support to deal with the usual stressors encountered in a competitive workplace. R. 310.

On initial review, DDS expert Stephen P. Saxby, Ph.D., found that Bottoms's mental impairments caused mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 213, 226. Dr. Saxby determined that Bottoms would be moderately limited in his ability to understand and remember detailed instructions, but he could be expected to understand and remember simple, one- and two-step instructions. R. 215, 228. He would be moderately limited in maintaining attention and concentration for extended periods, but he could work within a schedule and at a consistent pace, and he was not significantly limited in maintaining attendance or completing a normal workday or workweek without interruption. R. 215–16, 228–29. He would not require special supervision in order to sustain a work routine, and he could meet the basic mental demands of competitive work on a sustained basis despite his limitations. R. 216, 229. On reconsideration, DDS reviewing expert Eric Oritt, Ph.D., affirmed Dr. Saxby's findings. R. 245–49, 258–62.

In the submissions for Bottoms's first application for benefits, both he and Taylor reported functional difficulties relating to his cognitive abilities, including problems remembering, completing tasks, understanding, and following written and spoken instructions, although they did not state that this affected his physical functioning. *See* R. 139–49, 159–69, 185–92. Taylor explained that he had to remind Bottoms to care for his personal needs and help him understand household tasks, and he stated that Bottoms was unable to handle money or pay

attention for more than a minute. R. 139–40, 142–46. Bottoms himself described some difficulty with forgetting things, R. 166–68, 187, 190–91, but he did not otherwise seem to indicate that this interfered with everyday activities. In his testimony at the first administrative hearing, Bottoms stated that after his head injury he had to write things down to be able to remember them for more than a minute. R. 24, 28–29. He reported that on a regular day he helped around the house, went on walks, read, and watched television. R. 27. He went shopping once a month for personal items. *Id.* He could cook, but he only used the microwave because he would otherwise forget, leaving something on the stove or in the oven. R. 30. Bottoms testified that his impairment affected both his short- and long-term memory. *Id.* He denied having any problems using his hands. R. 28.

In his first decision denying Bottoms's claims, the ALJ adopted the opinions of the DDS examiners to the extent they found no limitations in handling short and simple instructions, and moderate limitations in handling detailed instructions and engaging in sustained concentration. R. 16. He gave partial weight to Dr. Russell's opinion to the extent it was consistent with his RFC determination, but did not explain his reasons for doing so. *Id.* As noted *supra*, he gave little weight to Dr. Young's opinion insofar as she found limitations related to Bottoms's back pain, R. 16–17, but he did not discuss her findings of manipulative and environmental limitations caused by Bottoms's slow mentation.

On appeal, Judge Crigler found that the ALJ failed to adequately account for other limitations alleged in the record. He noted that the RFC did not include any restriction relating to Dr. Russell's finding that Bottoms would need support in dealing with workplace stressors, and he observed that this finding was not contradicted by any other evidence in the record. R. 425–26. Judge Crigler next found that the ALJ's assessment that Bottoms was moderately limited in

handling detailed instructions and not at all limited as to simple instructions was insufficient to account for Dr. Russell's finding that Bottoms would be limited to simple *and repetitive* tasks. R. 426. He then turned to Dr. Young's opinion and found that the ALJ erred by failing to address her proposed limitations in driving, climbing, and working around heavy machinery.[6] R. 426–27. He stated that if the ALJ failed to include these limitations because he gave little weight to Dr. Young's opinion, he needed to say so and explain his reasoning. R. 427. As with his other findings, these portions of the Report and Recommendation were adopted in full. R. 418.

 *b. Second Application for Benefits*

From May 2011 through July 2012, Bottoms received outpatient mental health treatment for his cognitive difficulties. *See* R. 659–64 (May 24, 2011), 665–68 (July 18, 2011), 669 (Sept. 7, 2011), 670–71 (Oct. 28, 2011), 672 (Dec. 21, 2011), 673–75 (Mar. 7, 2012), 676–81 (May 24, 2012), 682 (June 7, 2012), 683 (July 5, 2012). At his intake appointment with Southside Community Services Board ("Southside CSB"), he was alert and oriented, with average insight, judgment, fund of information, and abstract thinking. R. 663. His affect was appropriate and attitude was cooperative. *Id.* He was noted to have problems with his immediate and recent memory. *Id.* He endorsed no depressive or manic symptoms. R. 664. He exhibited similar signs at his initial visit with the Halifax Behavioral Health Clinic, and his examiner noted moderate impairment of immediate recall and severe impairment of short-term memory, with a diagnosis of dementia caused by traumatic brain injury. *See* R. 667. Bottoms was prescribed Namenda, R. 668, and although he initially endorsed some subjective improvement with his memory, R. 669, by March 2012 he described having little benefit from the drug and it was discontinued, R. 674–

---

[6] As Judge Crigler noted, R. 427, the ALJ incorporated Dr. Young's finding of limitation with fine motor movement in his hypothetical to the VE. R. 36–37. The VE indicated that these manipulative limitations were "really a problem" with regard to Bottoms's ability to perform past relevant work, although the jobs he considered would otherwise be precluded by a limitation to work at the light exertional level. *Id.* The ALJ did not discuss these potential restrictions in his written opinion.

75. Joseph Smith, M.D., his clinician at Southside CSB, later prescribed Aricept, R. 682, but he never received this from the manufacturer, R. 683. Over the course of his treatment, Bottoms continued to exhibit impaired recall and short-term memory. R. 672, 674, 682. He later reported that he stopped attending treatment because of transportation problems. R. 731.

After the relevant period, Bottoms was twice taken to the hospital in an unresponsive state after experiencing seizures. *See* R. 851–88 (Feb. 8, 2014), 776–814 (Jan. 5, 2015). Doctors noted that his seizures were a result of his prior brain injury. R. 779. CT imaging of the head showed evidence of prior left frontal craniotomy and encephalomalacia in the left frontal lobe from previous infarction with hydrocephalus ex vacuo front horn left lateral ventricle. R. 810, 877.

On November 11, 2013, Bottoms appeared for an assessment with Dr. Sloop, a consultative examiner. R. 728–34. Early in the examination, Dr. Sloop observed problems with visual perception and processing oral information, and these difficulties persisted over the course of the assessment. R. 728. Bottoms complained of problems with memory and concentration, and expressed worry about being able to improve his condition and frustration when he was unable to remember events or people's names. R. 731. Bottoms put forward adequate effort and persistence during testing, but displayed a slow pace of responding. R. 730. On examination, he was casually and neatly dressed, maintained good eye contact, and was cooperative and cordial. R. 731. His behavior was unremarkable, with euthymic mood and congruent affect, and Dr. Sloop noted that he "seem[ed] to have little in the way of mood problems." *Id.* His thought process was logical, coherent, linear, and goal directed, but he had frequent instances of dysnomia. R. 731–32. He had no problems with thought content or perceptual distortions in his thinking, and he was oriented to person, place, and time. R. 732. He had at least moderate

impairment in concentration and attention. *Id.* Judgment was fair and insight was fair to poor. *Id.* Bottoms's immediate and recent memory were poor, and remote memory was fair to poor, spotty, and erratic. *Id.*

Bottoms scored 22 out of a possible 30 points on the Mini-Mental State Examination, Second Edition ("MMSE-2"), suggesting mild cognitive impairment. *Id.* He could repeat three words immediately after they were presented to him, but he could not recall them five minutes later. *Id.* In the serial sevens task, Bottoms completed five operations cooperatively, but performed poorly, making four errors. *Id.* He could repeat a simple sentence, follow a three-step oral command and a one-step written command, write a simple sentence, and adequately reproduce a simple geometric drawing. *Id.* Bottoms also completed the Wechsler Adult Intelligence Scale, Fourth Edition ("WAIS-IV"), in which he scored in the borderline range in verbal comprehension and perceptual reasoning, and in the extremely low range in working memory, processing speed, and full-scale IQ, with his lowest score in working memory. *Id.* On the Wechsler Memory Scale, Fourth Edition ("WMS-IV"), Bottoms scored in the extremely low range in all areas, including auditory memory, visual memory, visual working memory, immediate memory, and delayed memory. R. 733. Dr. Sloop stated that these results "clearly indicate[d] the presence of significant memory problems[,] with his capabilities in delayed memory and visual memory being especially deficient." *Id.* He diagnosed cognitive disorder not otherwise specified (memory functioning deficits) and found that Bottoms's prognosis was poor, as he could not expect improvement in memory or intellectual functioning. *Id.*

Dr. Sloop opined that Bottoms could perform simple and repetitive tasks, but he was unable to perform detailed and complex tasks on account of his lower intellectual functioning and severe memory problems. *Id.* Because he had few health problems and no evidence of

emotional problems, he could be expected to maintain regular work attendance. *Id.* Bottoms could perform simple and repetitive activities consistently, but he would need close supervision for any task requiring memory capability. *Id.* He could complete an ordinary workday or workweek without interruption, and he would not have problems with supervisors or coworkers. *Id.*

On initial review of Bottoms's SSI claim, DDS expert Dr. Saxby found that he had moderate restriction of activities of daily living, mild difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. R. 453. He had moderate limitations in remembering and carrying out short and simple instructions, maintaining attention and concentration, sustaining an ordinary routine without special supervision, making simple work-related decisions, traveling in unfamiliar places, and setting realistic goals and making plans independently of others. R. 456–57. He had marked limitations in remembering and carrying out detailed instructions, completing a normal workday or workweek without interruption from his symptoms, and performing at a consistent pace without unreasonable breaks. *Id.* Based on this mental RFC, in combination with visual and environmental limitations, *see* R. 454–56,[7] DDS determined that he was disabled as of May 10, 2013. R. 458–59. On initial review and reconsideration for his DIB applications, however, the DDS reviewers found that there was insufficient evidence to assess Bottoms's mental functioning prior to the DLI. *See* R. 430–43, 462–70. In the initial decision, it was explained that this was because Dr. Sloop's opinion was not issued until after the DLI. R. 437–38.

In his function report, Bottoms again stated that he had little difficulty with performing most everyday activities such as shopping, cleaning, and going on walks, *see* R. 609–12, but he

---

[7] The DDS physical health expert found no exertional or manipulative limitations, and the only postural limitation he found was that Bottoms should never climb ladders, ropes, or scaffolds. *Id.*

did not prepare his own meals, R. 611, could not handle money, R. 612, and struggled with forgetting things and being unable to finish tasks that he started, R. 613–15. At the second administrative hearing, he described problems with his short- and long-term memory, R. 390, and stated that his brother assisted him to make sure he did not hurt himself or make mistakes while performing tasks, R. 391. He did chores around the house such as sweeping and cleaning the bathroom, kitchen, and his bedroom. R. 394. He denied difficulty using his hands and stated that he could handle small items such as buttons and zippers. R. 392. Taylor also testified at the hearing, stating that Bottoms would sometimes "blank[] out" and had trouble remembering anything, including simple tasks such as making sure to shut the door or to turn off the stove. R. 397–98. He reported that Bottoms missed appointments and needed to be reminded to take his medications, and he stated that his cognitive problems had gotten worse over time. R. 398–99.

Dr. Muller, the psychological expert, testified that the record supported diagnoses of cognitive disorder and history of substance abuse. R. 378–79. He stated that Bottoms's IQ scores could not support findings of listing-level organic mental disorder or intellectual disability because the record was insufficient to show whether they reflected an acute decrease or difficulty with intellectual functioning manifested in Bottoms's developmental years. *See* R. 379–80. He agreed with Dr. Sloop's assessment that Bottoms would be capable of performing simple tasks, and he noted that these should be in a lower-stress environment that was "no[t] quota based and slower paced." R. 380. He found that the record did not indicate difficulties with social functioning or adapting to change. *Id.* Upon questioning from Bottoms's counsel, Dr. Muller opined that Dr. Sloop's finding that his memory scores were extremely low was not necessarily accurate, as these scores were commensurate with Bottoms's IQ scores, which Dr. Muller found to be moderate. R. 381–82. Dr. Muller further explained that Bottoms's cognitive difficulties

were primarily related to his memory, and so his impairment could be accommodated by limiting him to simple tasks requiring little memory and performed at a slower pace. R. 382–83. Bottoms's problems with his immediate memory could be addressed by having him perform tasks he would only need to learn once and then could repeat in the same manner. R. 384. He would also need to be kept away from hazards. *Id.*

In his second written opinion, ALJ Mates found that Bottoms's description of his symptoms was not fully credible. R. 357. For instance, although Bottoms claimed to have been unable to work because of memory loss from his traumatic brain injury (which the ALJ found to have happened in 1991), he had engaged in substantial gainful activity until 2008. *Id.* He found that mental status examination findings from Drs. Russell and Sloop, along with those of Bottoms's mental health providers, were minimal, with no evidence of mood disorder; organized, logical, and coherent thought processes; good calculation ability; and good abstract thinking. *Id.* (citing R. 304–11, 658–83, 727–34). He also described Bottoms's treatment as routine and conservative, consisting of medication that was helpful in improving his memory. R. 357–58. He noted that Bottoms reported being able to do a broad range of activities, such as going on walks, reading the newspaper, shopping, cleaning, riding the bus in the community, and going to the movies. R. 358.

As to the opinion evidence, the ALJ revisited the opinions of the DDS reviewers from Bottoms's first application for benefits, giving these opinions limited weight and giving greater weight to Dr. Muller's opinion, as he found it to be consistent with the credible evidence from the relevant timeframe. R. 358. He considered the DDS opinions relating to Bottoms's second DIB claim, noting that they found insufficient evidence prior to the DLI, and deferred to the findings of Dr. Muller. *Id.* He did not address the mental health findings of the DDS opinions

relating to Bottoms's second SSI claim. *See id.* The ALJ gave partial weight to Dr. Russell's and Dr. Sloop's opinions because these opinions supported a finding that Bottoms was able to perform simple, repetitive tasks. R. 359. He gave limited weight to Dr. Young's opinion, but did not speak to her findings regarding limitations caused by Bottoms's slow mentation. *See id.* He made no findings as to Bottoms's ability to perform fine motor movements with his hands.

  2.   *Analysis*

A claimant's RFC is a factual finding "made by the Commissioner based on all the relevant evidence in the [claimant's] record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011) (per curiam), and it must reflect the combined limiting effects of impairments that are supported by the medical evidence or the claimant's credible complaints, *see Mascio v. Colvin*, 780 F.3d 632, 638–40 (4th Cir. 2015). The ALJ's RFC assessment "must include a narrative discussion describing" how specific medical facts and nonmedical evidence "support[] each conclusion" in his RFC finding, *id.* at 636, and explaining why he discounted any "obviously probative" conflicting evidence, *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977); *see also Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014). In discharging his duty to provide an assessment of a claimant's "work-related abilities on a function-by-function basis," the ALJ must make specific findings about the impact of a claimant's impairments and credible, related symptoms on his ability to work. *Mascio*, 780 F.3d at 636 (quoting SSR 96-8p, 1996 WL 374184, at *1); *accord Monroe v. Colvin*, 826 F.3d 176, 187–88 (4th Cir. 2016).

Here, the ALJ's discussion as to Bottoms's alleged manipulative limitations with fine motor movement was insufficient. His opinion did not address Dr. Young's opinion relating such a limitation to Bottoms's slow mentation (rather than some sort of physical impairment), nor did

he mention her observation that Bottoms struggled to open a screw top bottle during the examination. Her opinion as to this area of functioning is not directly contradicted by any other opinion or medical evidence, and the ALJ should have discussed it. Nonetheless, his error in failing to do so was harmless, as Bottoms himself never complained of problems with using his hands, and upon direct questioning during both hearings he straightforwardly denied having such difficulties. Bottoms's statements combined with the dearth of any other evidence supporting a manipulative limitation lead to the conclusion that the ALJ's omission was harmless, as he would not have found any limitation in this area had he considered this part of Dr. Young's opinion.

More deficiencies are apparent in the ALJ's discussion of Bottoms's mental limitations, however. First, in spite of Judge Crigler's admonition that he explain the level of support Bottoms would need to be able to handle workplace stressors, the ALJ failed to expressly address this particular limitation. Arguably, this omission can be explained by the ALJ's reliance on the opinion of Dr. Muller, who did not assess a need for additional support, but did limit Bottoms to a low-stress work environment. Nonetheless, it is again concerning that the ALJ did not speak to an issue explicitly raised by this Court during Bottoms's prior appeal.

In addition, it is unclear whether the RFC accounts for the full scope of the limitations assessed by Dr. Muller, even though the ALJ gave this opinion the greatest weight. In his testimony, Dr. Muller explained that a "lower stress environment" suitable for Bottoms would be "no[t] quota based and slower paced." R. 380. On questioning from Bottoms's counsel, Dr. Muller reiterated that Bottoms should "go at a slower pace." R. 383. The ensuing exchange among Dr. Muller, counsel, and the ALJ is muddled, *see* R. 383–84, but it does not appear that Dr. Muller scaled back this limitation to jobs that simply were not fast paced. In questioning the

VE, the ALJ posed a hypothetical limiting Bottoms to work that was not fast paced or quota based, which the VE felt would allow for performance of Bottoms's past relevant work as a counter attendant. R. 403–04. The ALJ then posed a second hypothetical that included similar restrictions with the additional assumption that Bottoms's impairments would interfere with concentration, pace, and task persistence more than fifteen percent of the work day and would lead to more than two absences per month, which the VE found to be work preclusive. R. 406. The VE later clarified that he understood this second hypothetical to account for slower than average work pace. *See* R. 411–12. In his written opinion, however, the ALJ assumed without further explanation that Dr. Muller's limitation to a low-stress environment entailed work that was "not fast-paced and not quota-based," without discussing whether a limitation to slower than average pace was included in Dr. Muller's testimony or whether such a limitation was otherwise warranted. R. 356, 358. Because the VE noted that there was a material distinction between work performed at less than fast pace and work performed at less than average pace, the ALJ needed to better explain his reasoning.

Other findings in RFC discussion likewise do not withstand scrutiny. For instance, although the ALJ characterized Bottoms's course of treatment as conservative and effective, his analysis fails to mention that Bottoms's head injury was initially treated with brain surgery, that he often denied that his medications were very effective, or that Dr. Sloop found his prognosis to be poor. The conservative nature of Bottoms's treatment thus speaks little to the severity of his symptoms because more aggressive interventions had already been tried and any additional measures were not expected to lead to meaningful improvement. Likewise, although the ALJ found that Bottoms's credibility was undermined by his work history following his brain injury, he based this finding on his unexplained assumption that the injury occurred in 1991, even

though the record evidence for the date of Bottoms's injury suggested it happened as recently as 2007, *see supra* note 5, close to the time Bottoms stopped working.

Finally, the ALJ did not evaluate the opinions of the DDS reviewers who found Bottoms to be disabled after May 10, 2013, or otherwise attempt to reconcile that finding with his own. "[T]he disability determination of a state administrative agency is entitled to consideration in an SSA disability proceeding." *Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 343 (4th Cir. 2012) (citing *DeLoatche v. Heckler*, 715 F.2d 148, 150 n.1 (4th Cir. 1983)). This determination was highly relevant to Bottoms's claim even though it postdated the DLI. *See id.* at 341 ("[E]vidence created after a claimant's DLI, which permits an inference between the claimant's post-DLI state of health and [his] pre-DLI condition, could be the 'most cogent proof' of a claimant's pre-DLI disability." (quoting *Moore v. Finch*, 418 F.2d 1224, 1226 (4th Cir. 1969))). Bottoms's mental condition was clearly chronic in nature, and there is no evidence that it deteriorated significantly between the DLI and the onset date of his disability for SSI. Moreover, the DDS reviewers for Bottoms's DIB claims did not make findings as to his mental limitations specifically because Dr. Sloop's opinion was issued after the DLI (albeit less than a year later),[8] thus raising the question of whether they would have found Bottoms disabled had they considered this evidence. These deficiencies in the ALJ's RFC analysis raise considerable doubts, and thus I cannot find that his decision is supported by substantial evidence.

IV. Conclusion

---

[8] DDS's decision not to consider Dr. Sloop's opinion when evaluating Bottoms's DIB claim is itself puzzling, as Dr. Sloop's conclusions, based as they are on Bottoms's chronic mental impairment, would seem to relate back to the pre-DLI period. After all, Dr. Sloop's opinion was issued in November 2013, and the DDS physicians found Bottoms disabled as of May 2013. Nothing in the ALJ's opinion explains what changed in Bottoms's functional ability during these five months to justify the differing results of his claims.

For the foregoing reasons, I find that the Commissioner's final decision is not supported by substantial evidence. Accordingly, I respectfully recommend that Bottoms's Motion for Summary Judgment, ECF No. 13, be **GRANTED**, the Commissioner's Motion for Summary Judgment, ECF No. 17, be **DENIED**, this matter be **REMANDED** for further administrative proceedings, and this case be **DISMISSED** from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 23, 2017

Joel C. Hoppe
United States Magistrate Judge